UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JASON MONTONE,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Criminal No. 20cr10159<br><br>Violations:<br><br><u>Count One</u>: Conspiracy<br>(18 U.S.C. § 371)<br><br><u>Count Two</u>: Obstruction of Criminal<br>Investigation of Health Care Offense<br>(18 U.S.C. § 1518)<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 982(a)(7)) |

<u>INFORMATION</u>

At all times relevant to this Information:

<u>General Allegations</u>

1.     The defendant, JASON MONTONE ("MONTONE"), was a spine surgeon who lived in Lawson, Missouri and practiced medicine in Missouri and Kansas.

2.     Distributor 1 lived in Lenexa, Kansas and was the owner of Distribution Company.

3.     Distribution Company was located in Lenexa, Kansas and acted as a distributor for medical device manufacturers.

4.     Device Company was a medical device company located in Malden, Massachusetts that sold implants used in spine surgeries, such as plates, cages, screws, rods, and biologics.  While Device Company employed sales representatives to assist and provide support to physicians who used its products, Device Company worked with distributors, like Distributor

1

1, to provide customer support in some areas of the country.  Distributors like Distributor 1 were independent contractors and not fulltime employees of Device Company.

5.      Executive 1 was Device Company's President, Chief Executive Officer, and Director.

6.      Executive 2 was Device Company's Chief Financial Officer and Vice President of Business Development.

7.      Expert Company was a limited liability company owned by Executive 1 that purported to manage the process under which Device Company's physician-consultants received payments for their purported consulting beginning in 2013.

<u>Background on Spine Surgeries and Their Reimbursement</u>

8.      Hospitals or surgical centers where surgeons perform spine surgeries, such as spinal fusion surgery, typically submit a bill to a patient or a claim for reimbursement to an insurance carrier, including the Medicare Program ("Medicare") or Medicaid Program ("Medicaid"), for the costs associated with a surgery, including the costs of medical devices, such as spinal implants.  Physicians typically submit a separate claim for reimbursement to patients and/or insurance carriers, including Medicare or Medicaid, for the physician's services rendered during the surgical procedure.

9.      Spinal implants, such as screws, rods, cages, and plates are often kept in trays or kits that are held on a consignment basis at a hospital or surgical center where physicians perform spine surgeries.  When a physician uses a spinal implant in a surgery, such as a spinal fusion procedure, the hospital or surgical center orders a replenishment implant and pays the implant manufacturer for that replenished implant.  Often, a hospital or surgical center sends

replenishment orders to an implant manufacturer, like Device Company, on a surgery-by-surgery basis so that kits or trays from which the implant was used are complete and ready to be used in a future surgery.

<u>The Medicare and Medicaid Programs</u>

10.     Medicare is a federally-funded health care program that provides benefits to individuals who are sixty-five years of age or older, or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).  Individuals who qualify for Medicare benefits are commonly referred to as Medicare "beneficiaries."

11.     Medicare is subdivided into multiple Parts.  Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care.

12.     Medicaid is a jointly-funded, federal and state health care program that provides certain health benefits to the disabled, as well as to individuals and families with low incomes and resources.  At the federal level, Medicaid is administered by CMS.  CMS is responsible for overseeing the Medicaid program in participating states, including Massachusetts, Kansas, and Missouri.

13.      Medicare and Medicaid are "health care benefit programs" within the meaning of 18 U.S.C. § 24(b), and each is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), the federal Anti-Kickback Statute.

## Overview of the Conspiracy

14.     Between late 2012 and October 2015, MONTONE and his co-conspirators engaged in a scheme in which Device Company paid MONTONE $379,000 pursuant to a sham consulting program that paid MONTONE between $500 and $750 per hour for supposedly performing consulting services.  Although Device Company's physician-consulting program was purportedly directed at gathering technical feedback about its products from surgeons, in fact, Device Company used the program, and the kickbacks it paid to MONTONE pursuant to that program, to induce him to order and use Device Company's products, and to reward his use of Device Company's products.  During the course of the conspiracy, MONTONE, Distributor 1, and their co-conspirators represented that MONTONE spent hundreds of hours evaluating products, discussing industry trends, and educating residents.  In fact, MONTONE spent only a small fraction of his reported time performing actual consulting activities for Device Company. In exchange for the sham consulting payments from Device Company, MONTONE used over $4.5 million worth of Device Company's products in his surgeries, including excessive amounts of certain products.  During this time, MONTONE performed numerous surgeries on patients who were Medicare or Medicaid beneficiaries.  Device Company agreed with Distributor 1 to pay Distributor 1 a 25% commission on all Device Company products MONTONE used in his surgeries.

## Object and Purpose of the Kickback Conspiracy

15.     The object of the conspiracy was for MONTONE and his co-conspirators to unlawfully enrich themselves by offering, paying, and receiving kickbacks aimed at inducing

MONTONE to order, arrange for, use, and recommend Device Company's spinal implants in

violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(b) & (2)(b).

The Manner and Means

16.     Among the manner and means by which MONTONE and his co-conspirators,

known and unknown, carried out the conspiracy were the following:

a.  Setting up a sham physician-consulting program at Device Company
    purportedly directed at gathering technical feedback about Device
    Company's products.

b.  Selecting surgeons like MONTONE to participate in Device Company's
    sham physician-consulting program based not on their background,
    qualifications, education, and experience, but instead on their ability and
    willingness to use Device Company's products.

c.  Executing a sham consulting agreement under which MONTONE would
    be paid for using Device Company's spine products in his spine surgeries.

d.  Arranging for MONTONE to receive 10% of the revenue Device
    Company generated from MONTONE's use of Device Company's
    products in his surgeries.

e.  Filling out and submitting to Device Company falsified timesheets
    representing that MONTONE had performed a significant number of
    hours of consulting work for Device Company, when, in fact, MONTONE
    did little to no consulting work for Device Company and instead simply

used Device Company's products in his surgeries often in the presence of, or at the prompting of, Distributor 1.

    f.   Paying MONTONE for his use of Device Company's products in his spine surgeries under the pretext that he performed consulting work.

    g.   Tracking the sales volumes of MONTONE and other physician-consultants and using that information to determine how much MONTONE and other physician-consultants would be paid.

    h.   Using, and arranging for the use of, an excessive amount of Device Company's spine products in MONTONE's spine surgeries.

    i.   Increasing MONTONE's hourly rate based not on his experience or the quality of his work, but on his anticipated use of Device Company's products in his surgeries.

Overt Acts in Furtherance of the Conspiracy

17.    From in or about late 2012 through October 2015, MONTONE and co-conspirators known and unknown to the U.S. Attorney committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

*Executive 2 agreed to pay MONTONE 10% of the revenue MONTONE's surgeries generated for Device Company and paid MONTONE Kickback #1*

    a.   In late 2012 / early 2013, Distributor 1 had a phone conversation with Executive 2 about MONTONE becoming a consultant.  In that conversation, Executive 2 told Distributor 1 that MONTONE would get 10% of the revenue Device Company made from MONTONE's surgeries.

6

b.      In late 2012 / early 2013, MONTONE had a phone conversation with Executive 2 in which Executive 2 told him that if MONTONE became a consultant for Device Company, Device Company would pay MONTONE 10% of the revenue Device Company generated from MONTONE's use of its products in his surgeries.

c.      On or about March 8, 2013, MONTONE had a phone conversation with Executive 1 in which Executive 1 told MONTONE that he wanted MONTONE to use as many different Device Company products as he could.  Executive 1 told MONTONE that the more products MONTONE used, the more money MONTONE would make.

d.      On or about March 11, 2013, Executive 2 sent an email to MONTONE attaching a Clinical Advisor / Consulting Agreement that permitted MONTONE to bill Device Company up to 600 hours and $300,000 annually based on MONTONE's "increased interest and availability for feedback on several" Device Company products.

e.      On or about March 12, 2013, MONTONE had a conversation with a Territory Sales Manager for Device Company in which MONTONE and he discussed using Device Company's product for all of his cases.  On that same date, the Territory Sales Manager sent an email to Executive 1 and Executive 2 explaining that he had spoken to MONTONE, who "understands our position is willing to totally involve himself and use [Device Company] for all of his cases."

f.      On or about May 13, 2013, an employee of Device Company sent an email to Executive 2, copying Executive 1.  In that email, the employee explained that he had spoken to MONTONE and that MONTONE wanted to know the start date of his consulting

agreement and wanted to "backdate based on previous cases" he had performed using Device Company product.

g.      On or about May 22, 2013, Device Company sent Check No. 3185 signed by Executive 1 to MONTONE in the amount of $5,000.  At this point, MONTONE had not signed his consulting agreement with Device Company and had not submitted any timesheets documenting any purported consulting he performed.

*Kickback #2 – Payment to MONTONE for his use of Device Company product between May 1, 2013 and June 15, 2013*

h.      On or about June 15, 2013, Distributor 1 faxed to Device Company an Exhibit A timesheet prepared by Distributor 1 stating that MONTONE had performed 75 hours of consulting for Device Company between May 1, 2013 and June 15, 2013, when, in fact, MONTONE and Distributor 1 knew that MONTONE had performed substantially fewer than 75 hours of consulting.  During that six-week time period and pursuant to MONTONE's agreement with Device Company, MONTONE used $388,985 worth of Device Company products in his surgeries, including a single surgery on a Medicare beneficiary on or about June 10, 2013 in which he generated $95,950 in revenue for Device Company by using an excessive amount of Device Company's biologic product ("Biologic 1").  Executive 2 signed MONTONE's timesheet and approved the 75 hours he submitted (i) based on the amount of Device Company product MONTONE used and (ii) without taking any steps to confirm or assess how much consulting MONTONE actually performed.

i.      On or about July 11, 2013, in return for MONTONE using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3380 signed by Executive 1 to MONTONE in the amount of $37,500, or approximately 10% of the

amount MONTONE's surgeries generated for Device Company between May 1, 2013 and June 15, 2013.

*Kickback #3 – Payment to MONTONE for his use of Device Company product between June 16, 2013 and August 1, 2013*

j.      On August 1, 2013, Distributor 1 faxed to Device Company a timesheet prepared by Distributor 1 stating that MONTONE had performed 84 hours of consulting for Device Company between June 16, 2013 and August 1, 2013, when, in fact, both MONTONE and Distributor 1 knew that MONTONE had performed substantially fewer than 84 hours of consulting.  During that six-week time period, MONTONE used $420,135 worth of Device Company products in his surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about July 22, 2013 in which he generated $104,800 in revenue for Device Company by using an excessive amount of Biologic 1.   Executive 2 signed MONTONE's timesheet and approved the 84 hours he submitted (i) based on the amount of Device Company product MONTONE used and (ii) without taking any steps to confirm or assess how much consulting MONTONE actually performed.

k.      On or about September 17, 2013, in return for MONTONE using Device Company's products and pursuant to their agreement, Device Company sent Check No. 3666 signed by Executive 1 to MONTONE in the amount of $42,000, or approximately 10% of the revenue MONTONE's surgeries generated for Device Company between June 16, 2013 and August 1, 2013.

*Kickback #4 – Payment to MONTONE for his use of Device Company product
between August 2, 2013 and September 15, 2013*

l.      On or about October 3, 2013, Distributor 1 faxed to Device Company a

timesheet prepared by Distributor 1 stating that MONTONE had performed 24 hours of

consulting for Device Company between August 2, 2013 and September 15, 2013 when both

Distributor 1 and MONTONE knew that MONTONE had performed substantially fewer than 24

hours of consulting.  During that six-week time period, MONTONE used $125,805 worth of

Device Company products in his surgeries, including surgeries on Missouri Medicaid

beneficiaries.  Executive 2 signed MONTONE's timesheet and approved the 24 hours he

submitted (i) based on the amount of Device Company product MONTONE used and (ii)

without taking any steps to confirm or assess how much consulting MONTONE actually

performed.

m.      On or about October 4, 2013, in return for MONTONE using Device

Company's products and pursuant to their agreement, Device Company sent Check No. 3739

signed by Executive 1 to MONTONE in the amount of $12,000, or approximately 10% of the

revenue MONTONE's surgeries generated for Device Company between August 1, 2013 and

September 15, 2013.

n.      On or about October 4, 2013, Executive 2 sent an email to MONTONE,

Distributor 1, and Executive 1, attaching a new, sham consulting agreement under which Expert

Company (whose only employee was Executive 1's then girlfriend) would pay MONTONE for

consulting hours MONTONE purportedly performed for Device Company, which was one of

Expert Company's clients.  While the email and agreement implied that Device Company was

one of a number of clients of Expert Company, Device Company was in fact Expert Company's only client.

*Kickback #5 – Payment to MONTONE for his use of Device Company product in March 2014*

o.      On or about May 5, 2014, Distributor 1 faxed a timesheet that he prepared and that MONTONE signed, to Expert Company, which was handling consulting payments for Device Company pursuant to a new consulting agreement.  The timesheet stated that MONTONE had performed 32 hours' worth of consulting for Device Company in March 2014 when both MONTONE and Distributor 1 knew that MONTONE had performed substantially fewer than even 20 hours of consulting.  During that month, MONTONE used $100,945 worth of Device Company products in his surgeries, including surgeries on Missouri Medicaid beneficiaries.  On or about May 5, 2014, Executive 2 signed MONTONE's timesheet and approved 20 hours of consulting (i) based on the amount of Device Company product MONTONE used and (ii) without taking any steps to confirm or assess how much consulting MONTONE actually performed.

p.      On or about May 13, 2014, in return for MONTONE using Device Company's products and pursuant to their agreement, Expert Company sent Check No. 0000008031 to MONTONE in the amount of $9,500, or approximately 10% of the amount MONTONE's surgeries generated for Device Company during March 2014, minus a 5% fee charged by Expert Company.

*Kickback #6 – Payment to MONTONE for his use of Device Company product*
*between July 2014 and October 2014*

q.      On or about December 6, 2014 and December 10, 2014, Distributor 1 sent

Expert Company two timesheets he prepared with MONTONE's signature stating that

MONTONE had performed 80 hours of consulting for Device Company between July and

October 2014, including evaluations of 17 of Device Company's products.  MONTONE and

Distributor 1 knew, however, that MONTONE had performed substantially fewer than 80 hours

of consulting and that, in fact, MONTONE had never even used 14 of the 17 products

MONTONE and Distributor 1 claimed MONTONE had evaluated.  During this four-month

period, MONTONE used approximately $506,670 worth of Device Company products in his

surgeries, including a single surgery on a Missouri Medicaid beneficiary on or about August 4,

2014 in which he generated $95,200 in revenue for Device Company by using an excessive

amount of Biologic 1.  On or about December 6 and December 10, 2014, Executive 2 signed

MONTONE's timesheets and approved the 80 hours he submitted (i) based on the amount of

Device Company product MONTONE used and (ii) without taking any steps to confirm or assess

how much consulting MONTONE actually performed.

r.      On or about December 18, 2014, in return for MONTONE using Device

Company's products and pursuant to their agreement, Expert Company sent Check No.

0000008178 to MONTONE in the amount of $38,000, claiming that the payment was for

"Consult[ing] July-Oct 2014."  The $38,000 represented 80 hours at MONTONE's hourly

consulting rate of $500, minus Expert Company's 5% fee.

*Kickback #7 – Payment to MONTONE for his use of Device Company product
between January and February 2015*

s.      On or about March 12, 2015, Executive 2 sent MONTONE an email in
which he informed MONTONE that Device Company was increasing his purported hourly rate
from $500 to $750 based on his "increased consulting involvement on product development."  In
fact, MONTONE was not increasing his consulting involvement on product development and
Executive 2 knew that.  Executive 2 continued to approve payments to MONTONE (i) based on
the amount of Device Company product MONTONE used and (ii) not knowing how much
consulting MONTONE actually performed.

t.      On or about April 1, 2015, Distributor 1 faxed two timesheets he prepared
to Expert Company with the cut-and-pasted signatures of MONTONE.  The first timesheet
represented that MONTONE had performed 40 hours of consulting for Device Company in
January 2015.  MONTONE and Distributor 1 knew that MONTONE had performed no
consulting for Device Company that month.  During that month, MONTONE used
approximately $226,070 worth of Device Company products in his surgeries, including a single
surgery on a Missouri Medicaid beneficiary on or about January 19, 2015 in which he generated
$96,650 in revenue for Device Company by using an excessive amount of certain Device
Company products.  The second timesheet represented that MONTONE had performed 46 hours
of consulting for Device Company in February 2015.  MONTONE and Distributor 1 knew that
MONTONE performed no consulting for Device Company that month.  During that month,
MONTONE used approximately $180,370 worth of Device Company products in his surgeries,
including surgeries on Missouri Medicaid beneficiaries.

u.      On or about April 1, 2015, Executive 2 signed both MONTONE's January and February 2015 timesheets and approved all 86 hours he submitted (i) based on the amount of Device Company product MONTONE used and (ii) without taking any steps to confirm or assess how much consulting MONTONE actually performed.

v.      On or about April 14, 2015, in return for MONTONE using Device Company's products and pursuant to their agreement, Expert Company deposited into a bank account MONTONE controlled a total of $61,275, which represented the 86 hours MONTONE and Distributor 1 reported for January and February 2015 at MONTONE's then-new hourly consulting rate of $750, minus Expert Company's 5% fee.

<u>COUNT ONE</u>
Conspiracy to Commit Violations of the Anti-Kickback Statute
(18 U.S.C. § 371)

The United States Attorney charges:

18.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-17 of this Information.

19.     Between in or about late 2012 and October 2015, in the District of Massachusetts, and elsewhere, the defendant,

JASON MONTONE,

conspired with others to commit an offense against the United States, i.e., to violate the Anti-Kickback Statute, by knowingly and willfully offering, paying, soliciting, and receiving remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to induce the purchase of, order of, arranging for, use of, and recommendation of goods, services and items, namely, Device Company spinal implants, for which payment may be made in whole or in part by a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1-2).

All in violation of Title 18, United States Code, Section 371.

<u>COUNT TWO</u>
Obstruction of a Criminal Investigation of a Health Care Offense
(18 U.S.C. § 1518)

The United States Attorney further charges:

20.     The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 13 of this Information.

21.     Between in or about September 2017 and December 2018, in the District of Massachusetts, and elsewhere, the defendant,

JASON MONTONE,

willfully prevented, obstructed, misled, and delayed, and attempted to prevent, obstruct, mislead, and delay the communication of information and records relating to a violation of a Federal health care offense to a criminal investigator, to wit: MONTONE (i) created false documents purporting to show work he allegedly performed pursuant to a consulting agreement with Device Company and produced those fabricated documents in response to a subpoena issued to him from the United States Attorney's Office for the District of Massachusetts seeking documents relating to an investigation into potential violations of the Anti-Kickback Statute; and (ii) provided information he knew to be false to a Department of Health and Human Services Special Agent, who was duly authorized to conduct and engage in investigations and prosecutions for violations of health care fraud offenses, including potential violations of the Anti-Kickback Statute.

All in violation of Title 18, United States Code, Section 1518.

16

## CRIMINAL FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

22.     Upon conviction of one or more of the offenses set forth in Counts One (18

U.S.C. § 371) and Two (18 U.S.C. § 1518), the defendant,

JASON MONTONE,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7),

any property, real or personal, which constitutes or is derived, directly or indirectly, from gross

proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to the

following:

        a.      $379,000, to be entered in the form of a forfeiture money judgment.

23.     If any of the property described in Paragraph 22, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of

the defendant --

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the Court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without
            difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 22 above.

   All pursuant to Title 18, United States Code, Section 982(a)(7).


   _____*/s/ Patrick M. Callahan*_____
   PATRICK M. CALLAHAN (BBO# 648173)
   ABRAHAM R. GEORGE
   DAVID J. DERUSHA
   Assistant United States Attorneys
   1 Courthouse Way
   John Joseph Moakley Courthouse
   Boston, MA  02210
   Telephone:  617-748-3100


   DISTRICT OF MASSACHUSETTS,  _August 17_ , 2020